JRB/LM: USAO 2025R0058

✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED
4:44 pm, May 07 2025
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ M.G. _____ Deputy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | |
| JONATHON BONILLA FUENTES, | * | CASE NO. 8:25-mj-01239-AAQ |
| | * | |
| ERIKSON ARMAS ESTRADA, | * | CASE NO. 8:25-mj-01240-AAQ |
| | * | |
| JULIO CESAR PENA MARTINEZ, a/k/a BIG JULIO, | * | CASE NO. 8:25-mj-01241-AAQ |
| | * | |
| ISAIAH RICHARD SHARP, | * | CASE NO. 8:25-mj-01242-AAQ |
| | * | |
| INMAR HERNANDEZ CARCAMO, | * | CASE NO. 8:25-mj-01243-AAQ |
| | * | |
| and YEFRY REYES LOPEZ | * | CASE NO. 8:25-mj-01244-AAQ |
| | * | |
| Defendants. | * | **FILED UNDER SEAL** |
| | * | |

*******

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS AND ARREST WARRANTS

I, Brandon Twentymon, a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being first duly sworn, depose and state that:

### INTRODUCTION

1. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for violations of federal criminal law.

2. Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that, between at least in or about November 2024 through in or about April 2025, in the District of Maryland and elsewhere, the following individuals and others violated 21 U.S.C. § 846 (Conspiracy to Distribute Controlled Substances); 21 U.S.C. § 841(a),

1

(b)(1)(B) & (C) (Distribution and Possession with Intent to Distribute a Controlled Substance); 18 U.S.C. § 933(a)(2),(3) (Receipt of Firearm and Conspiracy to Receive Firearm); 18 U.S.C. § 933 (Conspiracy to Commit Firearms Trafficking); 18 U.S.C. § 922(g)(5)(A)(Possession or Receipt of a Firearm by an Alien); 18 U.S.C. § 922(a)(Transportation or Delivery of a Firearm to a Person from Another State); and 21 U.S.C. § 843(b) (Use of a Communication Facility for a Controlled Substance Offense):

      a.    **JONATHON BONILLA FUENTES ("BONILLA FUENTES");**

      b.    **ERIKSON ARMAS ESTRADA ("ARMAS ESTRADA");**

      c.    **JULIO CESAR PENA MARTINEZ  a/k/a BIG JULIO ("MARTINEZ");**

      d.    **ISAIAH RICHARD SHARP ("SHARP");**

      e.    **INMAR HERNANDEZ CARCAMO ("HERNANDEZ CARCAMO");** and

      f.    **YEFRY REYES LOPEZ ("REYES LOPEZ").**

3.    Except where otherwise noted, the information set forth in this affidavit is based upon my personal knowledge, my review of documents and other evidence and reports, and my conversations with law enforcement officers and other individuals. Because this affidavit is submitted for the limited purpose of seeking the requested criminal complaints and arrest warants, I have not set forth each and every fact learned during this investigation.

4.    Wherever in this affidavit I discuss information resulting from physical surveillance conducted during this investigation, that information, except where otherwise indicteed, does not necessarily set forth my personal observations, but rather has been provided directly or indirectly through other law enforcement officers who conducted such surveillance.

5.      Unless otherwise noted, wherever in this affidavit I asset that a statement was made, that statement is descibed in substance and is not intended to be a verbatim recitation of such staement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts, which are subject to further revision.

6.      Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge, including of this investigaiton, and reasoanble inferences I have drawn from my training, experience, and knowledge.

## BACKGROUND

7.      I have served as a law enforcement officer with the Metro Transit Police Department (MTPD) for over twenty-one years. Before my assignment to ATF, I served in the MTPD's Criminal Investigation Division for eighteen years, investigating serious criminal offenses including crimes related to homicide, attempted homicide, armed robbery, unlawful possession, carrying, and trafficking of firearms, and offenses related to the possession, distribution, and trafficking of narcotics.

8.      I have received basic and advanced training in general law enforcement, investigations, criminal law, and the laws governing arrest and search and seizure. In addition to federal authority, I am sworn and authorized with tri-state police jurisdiction, permitting me to enforce criminal law, make arrests, execute search and seizure warrants, and investigate crimes in the State of Maryland, the District of Columbia, and the Commonwealth of Virginia.

9.      Through training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies.

10.    Through training and experience, I have become familiar with the use of cellular telephones by narcotics traffickers to communicate; the patterns of activity of narcotics traffickers; the types and amounts of profits typically made by narcotics traffickers; and the methods, language, and terms used to obtain and distribute illicit drugs, and disguise the source and nature of the profits obtained from narcotics trafficking.

11.    I have participated in numerous investigations concerning drug trafficking organizations involved in the distribution of various controlled substances, including heroin, cocaine base or "crack" cocaine, phencyclidine (PCP), marijuana, and other controlled dangerous substances. I have participated in hundreds of hours of surveillance of drug dealers and drug traffickers and has observed hundreds of "hand-to-hand" drug transactions. Through these investigations, I have direct knowledge of the concealment methods utilized by drug and weapons traffickers, to include the use of "stash" houses and locations (locations where drug traffickers store narcotics that may be independent from their residences) utilized by drug traffickers to conceal weapons, narcotics, bulk currency, and drug distribution paraphernalia.

12.    As a result of this experience, I am familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics; the collection of money that represents the proceeds of narcotics trafficking; and money laundering. I am aware that drug traffickers often utilize several locations to store narcotics and narcotics proceeds, including, but not limited to their residences, vehicles, and "stash" houses. I am also aware that drug traffickers utilize "counter-surveillance" in order to evade law enforcement detection. Based on my training and experience, drug traffickers also use cellular telephones, residential telephones, addresses, and vehicles that may not be subscribed in their own names to avoid detection by law enforcement.

13.     I have also learned through training and experience that narcotics traffickers often use and retain firearms and other weapons to protect themselves and their proceeds, as well as to secure their cache of narcotics.

## THE TARGETS

14.     As discussed below, **BONILLA FUENTES** is a cocaine, fentanyl, and firearms retailer and distributor. Investigators monitored **BONILLA FUENTES**'s communications and location information while he was utilizing TARGET TELEPHONE 1 and TARGET TELEPHONE 2 pursuant to court-authorized pen register and a trap and trace device (PRTT) orders and search warrants. **BONILLA FUENTES** is believed to reside in Mount Rainer, Maryland. According to the Alien Immigration Query (IAQ) database maintained by Immigration and Customs Enforcement (ICE), **BONILLA FUENTES** is a citizen of El Salvador and is subject to removal proceedings.  **BONILLA FUENTES** has previously been granted an employment authorization document and granted deferred action of removal proceedings. He is not authorized to possess, transfer, or receive a firearm.

15.     As discussed below, **ARMAS ESTRADA** is a fentanyl, cocaine, and firearms retailer and distributor. Investigators have monitored **ARMAS ESTRADA**'s communications and location information while he was utilizing TARGET TELEPHONE 3 pursuant to court-authorized PRTT orders and search warrants.

16.     As discussed below, **MARTINEZ** is a fentanyl, cocaine, retailer and distributor. Investigators have monitored **MARTINEZ**'s communications associated with TARGET TELEPHONE 4 pursuant to court-authorized PRTT orders and search warrants. **MARTINEZ** is believed to reside in Jersey City, New Jersey.

17.     As discussed below, **SHARP** is a firearms trafficker. Investigators have monitored **SHARP**'s communications while he was utilizing TARGET TELEPHONE 5 pursuant to court-authorized PRTT orders and search warrants. **SHARP** is believed to reside in Indiana, Pennsylvania.

18.     As discussed below, **HERNANDEZ CARCAMO** is a firearms trafficker. Investigators have monitored **HERNANDEZ CARCAMO**'s communications pursuant to court-authorized PRTT orders and search warrants. **HERNANDEZ CARCAMO** is a citizen of El Salvador and is an alien not authorized to reside in the United States. According to the Alien Immigration Query (IAQ) database maintained by ICE, **HERNANDEZ CARCAMO** received a final order of removal from the United States on June 15, 2006. He currently has an outstanding warrant of removal pending with ICE.

19.     As discussed below, **REYES LOPEZ** is a firearms trafficker. Investigators have monitored **REYES LOPEZ**'s communications pursuant to court-authorized PRTT orders and search warrants. According to the IAQ database, **REYES LOPEZ** is a citizen of El Salvador and is an alien not authorized to reside in the United States. **REYES LOPEZ** received a final order of removal on January 30, 2025. He currently has an outstanding warrant of removal pending with ICE, however, he cannot currently be removed to El Salvador because of a withholding of removal. He is not authorized to possess, transfer, or receive a firearm.

20.     Based on a review of public records, **SHARP**, **HERNANDEZ CARCAMO**, **REYES LOPEZ**, and **BONILLA FUENTES** were not licensed firearm dealers, nor did any of them possess a Maryland Handgun Qualification License required by Md. Code Ann., Public

Safety, § 5-117.1(b) or (c) to be presented by a purchaser, lessee, or transferee of a handgun to a person selling, renting, or transferring that handgun.

**PROBABLE CAUSE**
*Background*

21.     Beginning in or about November 2024, ATF began an investigation into firearms and narcotics trafficking taking place in the Washington, D.C. and Prince George's County region. In or about November 2024, Confidential Source #1 (CS-1) provided information about **BONILLA FUENTES** and **ARMAS ESTRADA** as sources of supply of cocaine and firearms. CS-1 also identified Associate 1 and Associate 2 (collectively, "the Associates") as being cocaine and firearms suppliers.

22.     CS-1 is registered with ATF, MTPD, and the Metropolitan Police Department (MPD). CS-1 has served as an informant for approximately ten years and has demonstrated credibility and reliability. CS-1 has never knowingly made any statements that were known to be untruthful to your affiant or other agents involved in this investigation. The information that CS-1 provided was corroborated to the extent possible through surveillance and controlled purchases of narcotics and firearms. ATF compensated CS-1 for the assistance provided to law enforcement. CS-1 has a criminal history that includes a conviction in 2006 for operating a motor vehicle while intoxicated and a conviction in 2007 for operating a motor vehicle while intoxicated and obstruction of justice without threats or force.

23.     Between November 21, 2024, and April 29, 2025, law enforcement conducted 15 controlled purchases with **BONILLA FUENTES** or **ARMAS ESTRADA**. In total, law enforcement purchased approximately 18 firearms, 700 grams of suspected cocaine, and 1600 grams of suspected fentanyl during the controlled purchases. The suspected cocaine and suspected fentanyl sold by **BONILLA FUENTES** tested positive for those substances through field testing.

The suspected cocaine and suspected fentanyl pills sold by **ARMAS ESTRADA** tested positive at the DEA Mid-Atlantic Laboratory for the presence of cocaine and in the case of the suspected fentanyl pills, fentanyl and methamphetamine. Investigators have monitored the communications of **BONILLA FUENTES**, **ARMAS ESTRADA**, and the Associates pursuant to court-authorized PRTT orders and their location information and historical call records pursuant to court-authorized search warrants.

### I.    *Controlled Purchases with BONILLA FUENTES*

### *November 21, 2024: Purchase of Cocaine*

24.    From November 20, 2024, to November 21, 2024, CS-1 arranged a purchase of cocaine with **BONILLA FUENTES** over recorded phone calls and non-recorded in-person interactions. CS-1 asked where they would meet, and **BONILLA FUENTES** told CS-1 to meet him at 3314 Chauncey Place, Mt. Rainer, Maryland.

25.    On November 21, 2024, CS-1 conducted a controlled purchase of approximately 14.74 grams of suspected cocaine from **BONILLA FUENTES** at 3314 Chauncey Place. (Controlled purchases at 3314 Chauncey Place typically occurred in the parking lot immediately adjacent to the address, itself a multi-storied apartment building.) The controlled purchase was audio and video recorded. During the purchase, CS-1 and **BONILLA FUENTES** engaged in conversation regarding CS-1 purchasing a firearm for their cousin. **BONILLA FUENTES** stated that he did not have a firearm now, but he could acquire firearms for CS-1.

### *November 22, 2024: Purchase of a Firearm*

26.    On November 22, 2024, CS-1 arranged a controlled purchase of a firearm with **BONILLA FUENTES** at 3314 Chauncey Place via telephone and in-person interactions. That same day, at approximately 6:28 p.m., law enforcement observed Associate 1's vehicle, previously identified by the investigation and surveillance, in the area of 3314 Chauncey Place. The vehicle

departed the area and returned at approximately 7:56 p.m. **BONILLA FUENTES** was observed exiting the vehicle right before calling CS-1. CS-1 arrived at the location at approximately 7:58 p.m., and purchased from **BONILLA FUENTES** one Polymer 80 pistol, a 9mm, bearing serial number SA26237, with 12 rounds of ammunition in the magazine. The transaction was video and audio recorded.

### *December 9, 2024: Purchase of Cocaine*

27.    On December 9, 2024, CS-1 and an ATF Undercover Special Agent (UC) conducted a controlled purchase of approximately 15.02 grams of suspected cocaine from **BONILLA FUENTES** at 3314 Chauncey Place. For the controlled purchase, the UC was equipped with an audio and video recording device.

28.    At approximately 7:01 p.m., law enforcement observed **BONILLA FUENTES** arrive in the area of 3314 Chauncey Place in the gray Honda Civic observed by investigators at the prior controlled buy. **BONILLA FUENTES** entered the UC's vehicle and provided the UC with his telephone number. **BONILLA FUENTES** told the UC that his source of cocaine had arrived, and that the source was parked behind the UC. **BONILLA FUENTES** then exited the UC's vehicle and entered the unidentified source's SUV. The UC observed **BONILLA FUENTES** exit the SUV and return to the UC's vehicle with a paper McDonald's bag containing the suspected cocaine. The UC asked **BONILLA FUENTES** if he would lower the price of the cocaine, and **BONILLA FUENTES** exited the UC 's vehicle again to meet with the cocaine source in the SUV. **BONILLA FUENTES** returned to the UC's vehicle and stated his source would lower the price to $1,100.00 in U.S. currency. The UC agreed to that price for future purchases.

29.    The UC also asked **BONILLA FUENTES** if he was able to obtain firearms, to which **BONILLA FUENTES** affirmed. **BONILLA FUENTES** stated that he had a Brazilian

contact from Houston, Texas who sends firearms to New York and can provide him with firearms. **BONILLA FUENTES** further stated that he could order any type of firearms from this contact. The UC and **BONILLA FUENTES** agreed to remain in contact to discuss firearms prices.

30.     Based on your Affiant's training, knowledge, and experience, drug traffickers often confirm the price of their drugs with customers and receive approval of the customer's proposed price with the source of their drugs before completing a drug transaction. In this instance, it appears that **BONILLA FUENTES** had to get approval from the cocaine supplier after negotiating the price with the UC.

### *December 11, 2024: Purchase of Cocaine and Two Firearms*

31.     On December 11, 2024, **BONILLA FUENTES** sold the UC approximately 26.6 grams of suspected cocaine and two firearms—one Ruger pistol, model LCP, .380 caliber, bearing serial number 371858449, and one Ruger pistol, model LCP, .380 caliber, bearing serial number 371295345—at 3314 Chauncey Place. The UC and **BONILLA FUENTES** arranged the deal over text messages and recorded phone calls. During the controlled purchase, **BONILLA FUENTES** stated that he had two more firearms to sell and showed the UC a video on his mobile phone of the two firearms. The controlled purchase was audio and video recorded.

32.     Based on my training, knowledge, and experience, it is common for firearms traffickers to show their customers photos or videos of their inventory.

### *January 8, 2025: Purchase of Cocaine and Two Firearms*

33.     On January 8, 2025, **BONILLA FUENTES** sold the UC approximately 53.3 grams of suspected cocaine and two firearms—one Taurus, model G2C, 9mm pistol bearing serial number AEB070199 and one Smith & Wesson, model SD9VE, 9mm pistol bearing serial number FDC4499—at 3314 Chauncey Place. The controlled purchase was audio and video recorded.

34.     **BONILLA FUENTES,** using TARGET TELEPHONE 1**,** called the UC on January 8, 2025, to arrange a firearm sale. During the recorded phone call, **BONILLA FUENTES** told the UC that he had two firearms for sale. The UC responded that he was interested in purchasing the two firearms and two ounces of cocaine. **BONILLA FUENTES** told the UC that the firearms and cocaine would be available the following day.

### January 22, 2025: Purchase of Cocaine and Two Firearms

35.     On January 22, 2025, the UC purchased approximately 57.8 grams of suspected cocaine and two firearms—one Taurus, model G2C, 9mm pistol bearing serial number AEB070199 and one Rock Island Armory, model 206, .38 caliber revolver bearing serial number RIA2792182—from **BONILLA FUENTES** at 3314 Chauncey Place.   During the deal, **BONILLA FUENTES** and the UC engaged in conversation regarding **BONILLA FUENTES**'s firearm and narcotics sources. At one point during the conversation, the UC asked **BONILLA FUENTES** when he was going to Texas to acquire more firearms, and **BONILLA FUENTES** responded that he did not know when he would return to Texas because it had turned into a "shit show" and that his gun source was out until the issue was resolved.

### March 10, 2025: Purchase of Fentanyl, Cocaine, and Two Firearms

36.     On March 10, 2025, **BONILLA FUENTES** sold the UC approximately 48.2 grams of suspected fentanyl pills, approximately 112.7 grams of suspected cocaine, and three firearms— one Taurus, model 856, .38 caliber revolver bearing serial number LX12947; one Ruger, model LCP, 380 caliber pistol bearing serial number 372611543; and one Ruger, model LCP, 380 caliber pistol bearing serial number 3726115470—at 3314 Chauncey Place. The controlled purchase was audio and video recorded. **BONILLA FUENTES** and the UC arranged the deal over text messages and recorded phone calls. During their preparatory conversations, **BONILLA FUENTES** relayed

to the UC that he had three firearms for sale. The UC ordered the three firearms and four ounces of cocaine. **BONILLA FUENTES** told the UC in a subsequent conversation that he had a fentanyl pills source of supply who had three hundred pills for sale for $6.50 per pill, and the UC replied that he would also purchase the fentanyl pills.

37.     The day of the deal, the UC contacted **BONILLA FUENTES** to let him know when the UC would arrive at the deal location. **BONILLA FUENTES** responded that he was picking up the items for the deal and that he would arrive around 7:10 p.m. At approximately 7:10 p.m. **BONILLA FUENTES** arrived and exited the passenger side of Associate 2's white Nissan Altima, which had been observed by law enforcement at the last deal. **BONILLA FUENTES** entered the front passenger seat of the UC vehicle, and the Altima departed the area.

38.     During the deal, **BONILLA FUENTES** informed the UC that he was waiting for his fentanyl source to answer him so that he could obtain the pills. **BONILLA FUENTES** contacted the source and asked him to drive to the deal location. **BONILLA FUENTES** then exited the UC's vehicle and directed a black Honda Civic to park next to the UC's vehicle. When the black Honda arrived at the scene, **BONILLA FUENTES** exchanged a bag with the driver of the vehicle. **BONILLA FUENTES** then re-entered the UC vehicle and handed the suspected fentanyl pills to the UC. **BONILLA FUENTES** informed the UC that he was going to speak to his fentanyl source about acquiring more pills and selling them for a better price. **BONILLA FUENTES** exited the UC's vehicle and walked over to the front passenger's side of the black Honda Civic to speak with the driver.

39.     Following the controlled purchase, the black Honda Civic entered the apartment complex at 5421 16th Avenue, Hyattsville, Maryland. Shortly thereafter, the vehicle departed the complex and drove to 3105 Queens Chapel Road, Mount Rainier, Maryland. In the parking lot,

the black Honda Civic was accompanied by Associate 1's gray Honda and Associate 2's white Nissan Altima. The occupants of all three vehicles initially conversed with each other through their windows. At approximately 7:42 p.m., Associate 1 and Associate 2 exited their vehicles and engaged in conversation with one another. Associate 1 made a phone call and looked in the direction of the third-floor apartment window. An individual in the window threw a clear plastic bag out of the window, and Associate 1 placed the bag in the trunk of his vehicle. The individual in the window then threw multiple red plastic bags out of the window, which were collected by Associate 1. Associate 1 then placed items from the back seat of his gray Honda into the red plastic bags. At approximately 7:44 p.m., the black Honda Civic departed the parking lot, and Associate 1 entered the apartment building through the side entrance.

40.    Based on prior surveillance and other investigative methods, I know that 5421 16th Avenue, Hyattsville, Maryland is the residential address of **ARMAS ESTRADA**. Additionally, I know through the course of the investigation that **ARMAS ESTRADA** is the driver of the black Honda, and that **ARMAS ESTRADA** previously used this vehicle during a controlled purchase operation conducted by the Drug Enforcement Administration (DEA). Through the course of my investigation, I know that **BONILLA FUENTES** will be driven to deal locations by either **ARMAS ESTRADA**, the Associates, or other individuals involved in the criminal trafficking activity. Furthermore, based on my knowledge, training, and experience, I know that it is common for narcotics traffickers to return to the stash location after a deal to restock on narcotics immediately after a drug sale.

## II.    BONILLA FUENTES's Source of Firearm Supply: SHARP

41.    On November 22, 2024, **BONILLA FUENTES** sold the UC one P80, 9mm pistol bearing serial number SA26237 with 12 rounds of ammunition in the magazine for $900.00 in

U.S. currency. According to transactional data obtained from Zelle, **BONILLA FUENTES** transferred $700.00 in U.S. currency to the Zelle account registered to **REYES LOPEZ** approximately one hour after the controlled purchase concluded.

42.     On December 11, 2024, **BONILLA FUENTES** sold the UC two Ruger LCP .380 caliber firearms for $2,900.00 in U.S. currency. After the controlled purchase, **REYES LOPEZ** sent **HERNANDEZ CARCAMO** a Zelle payment of $900.00 in U.S. currency. Trace reports and firearms purchase records indicate that **SHARP** bought the Ruger LCP firearms sold to the UC in Indiana, Pennsylvania, on July 15, 2023, and November 4, 2023.

*January 22, 2025: Sale of Firearms*

43.     On January 22, 2025, **BONILLA FUENTES** sold the UC two firearms—a Rock Island Arms .38 caliber revolver and a Taurus G2C 9mm caliber pistol—for $4,100.00 in U.S. currency in a transaction recorded by audio and video. Trace reports and firearms purchase records indicate that **SHARP** bought a Taurus G2C in Indiana, Pennsylvania on December 21, 2024. According to a PRTT, **SHARP** and **HERNANDEZ CARCAMO** exchanged text, image, and/or video messages on WhatsApp on December 26, 2024—five days after **SHARP** purchased the G2C firearm in Indiana, Pennsylvania.

*Negotiation and March 10, 2025 Purchase of Firearms*

44.     On March 6, 2025, based on a PRTT on TARGET TELEPHONE 1, **BONILLA FUENTES** received an image message from **REYES LOPEZ**, followed by an exchange of text messages. Later that day, **BONILLA FUENTES** sent the UC a photograph of two Ruger LCP firearms and one .38 caliber revolver firearm. On March 10, 2025, **BONILLA FUENTES** sold the UC two Ruger LCP firearms, a .38 caliber revolver, suspected cocaine, and suspected fentanyl pills. Leading up to this controlled purchase, **BONILLA FUENTES** communicated with **REYES LOPEZ** and the UC simultaneously. While the UC exchanged messages or calls with **BONILLA**

**FUENTES** to arrange the controlled purchase, **BONILLA FUENTES** exchanged text messages, voice messages, image messages, or phone calls with **REYES LOPEZ**, primarily through WhatsApp.

45.    According to a PRTT, on March 10, 2025, **BONILLA FUENTES** reached out to **REYES LOPEZ** right after telling the UC that he was retrieving the firearms from his source. Based on cellphone data, Associate 1 traveled to **REYES LOPEZ**'s residence before the controlled purchase occurred, and **BONILLA FUENTES** traveled to **REYES LOPEZ**'s address after the transaction concluded. Following the controlled purchases on March 10, 2025, and March 17, 2025, **BONILLA FUENTES** immediately messaged or called **REYES LOPEZ** after he sold the firearms to the UC. Based on my training and experience as a narcotics and firearms trafficking investigator, I know this pattern of communication typically suggests that a dealer is arranging to acquire contraband and facilitating a payment meeting with the supplier following a deal.

### March 17, 2025: Sale of Firearms

46.    On March 5, 2025, **SHARP** purchased two Taurus G3C pistols in Indiana, Pennsylvania.

47.    On March 17, 2025, **BONILLA FUENTES** contacted the UC through text messages and recorded phone calls. **BONILLA FUENTES** sent the UC a photograph of two Taurus G3C pistols for sale. The UC negotiated a purchase price of $1,150.00 in U.S. currency for each firearm and arranged to meet with **BONILLA FUENTES** later that evening. However, **BONILLA FUENTES** told the UC that he was not going to make it, so he was going to have Associate 2 arrive at the location to deliver the firearms. When the UC arrived at the deal location, Associate 2 entered the UC's vehicle and introduced himself as "Yeison." Associate 2 handed the UC two firearms wrapped in a black plastic bag.

48.     The firearms that Associate 2 sold to the UC were the same Taurus G3Cs purchased by **SHARP** in Indiana, Pennsylvania, on March 5, 2025. Following the controlled purchase, **REYES LOPEZ** sent $1,100.00 in U.S. currency to **HERNANDEZ CARCAMO**.

*April 29, 2025: Sale of Firearms*

49.     **SHARP**, a Pennsylvania resident, is a labor employee at a construction site in Frederick, Maryland. Since April 2025, **SHARP** has driven from Pennsylvania to Maryland on the weekends and stays at different hotels ahead of his work week. On April 1, 2025, at approximately 6:50 p.m., **SHARP** and **HERNANDEZ CARCAMO** traveled to the interchange of Maryland Routes 70 and 97, located approximately halfway between Frederick County, Maryland and **HERNANDEZ CARCAMO**'s residence in Baltimore City, Maryland. The two met in person for approximately 10 minutes before returning to their respective home and hotel.

50.     The following week, on April 7, 2025, at approximately 6:45 p.m., **SHARP** and **HERNANDEZ CARCAMO** again met in person for approximately 10 minutes in the Maryland Routes 70 and 97 area.

51.     On April 16, 2025, at approximately 7:30 p.m., **SHARP** traveled from Frederick County, Maryland, to the area of **HERNANDEZ CARCAMO's** residence in Baltimore, Maryland (a residential neighborhood). According to the location data from TELEPHONE TARGET 5, the two individuals met for less than 15 minutes before **SHARP** returned to Frederick County, Maryland.

52.     On April 25, 2025, at approximately 10:57 a.m., the UC contacted **BONILLA FUENTES** to arrange a controlled purchase of firearms. Following their exchange, **BONILLA FUENTES** exchanged messages with **REYES LOPEZ**. At approximately 11:14 a.m., **BONILLA FUENTES** then contacted the UC again. Between 11:58 a.m. and 1:23 p.m., while exchanging

messages with the UC, **BONILLA FUENTES** exchanged messages with **REYES LOPEZ**, who exchanged messages with **HERNANDEZ CARCAMO**. **BONILLA FUENTES** and the UC arranged for a controlled purchase on April 29, 2025.

53.    At approximately 1:04 p.m., **HERNANDEZ CARCAMO** sent **REYES LOPEZ** WhatsApp image messages. **REYES LOPEZ** then sent WhatsApp messages to **BONILLA FUENTES**. Approximately two minutes later, **BONILLA FUENTES** sent an image to the UC featuring three firearms for sale: two .380 caliber Ruger LCP pistols and one Taurus pistol. The serial number of one of the Ruger LCPs was visible in the photo: 379135494.

54.    On April 29, 2025, **BONILLA FUENTES** and the UC arranged to meet to conduct a firearms transaction. The communications were recorded. The morning of April 29, 2025, **BONILLA FUENTES** simultaneously messaged **REYES LOPEZ** while also communicating with the UC about the details of the transaction. At approximately 7:00 p.m., **BONILLA FUENTES** informed the UC that two of his associates—who were parked nearby in a maroon Honda Pilot SUV—would deliver the firearms to the UC. Minutes later, the maroon Honda pilot pulled up behind the UC's vehicle, and the unidentified driver of the vehicle delivered three firearms to the UC. The UC purchased three firearms from the driver via **BONILLA FUENTES**: a Taurus G2C pistol, 9mm, bearing serial number AEC165649, purchased by **SHARP** on April 13, 2025, in Indiana, Pennsylvania; a Ruger LCP pistol, .380 caliber, bearing serial number 379135494, purchased by **SHARP** on November 2, 2024, in Indiana, Pennsylvania; and a Ruger LCP pistol, .380 caliber, bearing serial number 371911832, purchased by **SHARP** on April 25, 2024, in Indiana, Pennsylvania.

55.    ATF personnel maintained covert surveillance of the Honda Pilot after the transaction as it traveled to a nearby parking lot in the same apartment complex. **BONILLA**

**FUENTES** arrived in his white Honda Civic.  The Honda Pilot then followed **BONILLA FUENTES**'s Honda Civic to the area of 34th Avenue and Allison Street, Mt. Ranier, MD.

*May 1, 2025: Messages to UC*

56.     On May 1, 2025, **BONILLA FUENTES** texted the UC to inform him that he had additional firearms available for sale. He sent the UC a photograph of two pistols: a SAR Arms B6C and a GForce Arms 1911. The makes and models of the pistols shown in the photo are the same as two handguns that **SHARP** purchased on April 19, 2025. The picture that **BONILLA FUENTES** forwarded to the UC was a screenshot taken at 2:14 p.m. from a message sent by "Inmar."

57.     A review of May 1, 2025, intercepted PRTT data revealed the following:

a.      At 10:57 a.m., **REYES LOPEZ** and **HERNANDEZ CARCAMO** exchanged several messages.

b.      Between 11:00 a.m. and 2:25 p.m., **HERNANDEZ CARCAMO** and **SHARP** exchanged several messages. The exchange included **SHARP** sending **HERNANDEZ CARCAMO** two image messages at 11:12 and 11:14 a.m.

c.      At 2:13 p.m., **HERNANDEZ CARCAMO** sent **REYES LOPEZ** two image messages.

d.      At 2:14 p.m., **REYES LOPEZ** sent **BONILLA FUENTES** one image message.

e.      At 2:49 p.m., **BONILLA FUENTES** sent an image to the UC that appears to be comprised of two separate images individually stamped with the time 2:13 p.m., as shown below.

f.    Pen register data indicates that **BONILLA FUENTES** has no direct contact with **HERNANDEZ CARCAMO** and that **REYES LOPEZ** sent **BONILLA FUENTES** a photo message at the same time displayed in the screenshot sent to the UC.



58.    A review was conducted by ATF of the WhatsApp and voice call records of **SHARP**, **HERNANDEZ CARCAMO, REYES LOPEZ,** and **BONILLA FUENTES.** **BONILLA FUENTES** had no contact with **SHARP** or **HERNANDEZ CARCAMO**, and no contacts in common except that **HERNANDEZ CARCAMO** and **REYES LOPEZ** were in contact with each other as described above. **REYES LOPEZ** had no contact with **SHARP**, and no contacts in common except that **HERNANDEZ CARCAMO** and **SHARP** were in contact

with each other as described above. A review of **SHARP**'s PRTT data revealed only one other

contact—other than **HERNANDEZ CARCAMO**—in the greater Washington, D.C. area, and the

timing of those communications had no correlation to the illicit firearms purchases described

above.

59. On at least two occasions, on April 13 and April 19, 2025, **HERNANDEZ**

**CARCAMO** and **SHARP** exchanged messages and photos within minutes of **SHARP** purchasing

a firearm in Pennsylvania.

60. Pursuant to 18 U.S.C. § 933(a)(1), transfers of a firearm in or affecting interstate or

foreign commerce are prohibited if the transferor knows or has reasonable cause to believe that the

use, carrying or possession of a firearm by the recipient would constitute a felony, including any

offense under Federal or State law punishable by imprisonment for a term exceeding one year.

Pursuant to 18 U.S.C. § 933(a)(2), receipt of a firearm in or otherwise affecting interstate or foreign

commerce is prohibited if the recipient knows or has reasonable cause to believe that such receipt

would constitute a felony (as similarly defined).

61. Maryland Code, Public Safety, § 5-144 makes knowingly participating in the illegal

sale, rental, transfer, purchase, possession, or receipt of a regulated firearm in violation of subtitle

1 a crime. Within subtitle 1, Md. Code, PS, § 5-117.1(b) prohibits a person from selling, renting,

or transferring a handgun to a purchaser, lessee, or transferee unless the purchaser, lessee, or

transferee presents a valid handgun qualification license. Pursuant to Maryland Code Ann., Public

Safety, § 5-117.1(c), a person may purchase, rent, or receive a handgun only if the person possesses

a valid handgun qualification license (or other credential also not possessed by **BONILLA**

**FUENTES, ARMAS ESTRADA, MARTINEZ**, **SHARP, HERNANDEZ CARCAMO**, and

**REYES LOPEZ**).

62.    Pursuant to the Maryland statutes above, participating in a transfer of a handgun as either the transferor or transferee where the transferee/recipient does not present or possess a handgun qualification license is prohibited and a criminal offense pursuant to Md. Code, PS, § 5-144.  The potential penalty for a violation of Md. Code, PS, § 5-144 is imprisonment not exceeding 5 years or a fine not exceeding $10,000 or both.  A violation of Md. Code, PS, § 5-144 is a felony within the meaning of 18 U.S.C. § 932(a)(3) (defining "felony") and 18 U.S.C. § 933 (incorporating definition from § 932(a)(3)).

63.    Based on my training, experience and knowledge of this investigation, there is probable cause to believe that **SHARP**, **HERNANDEZ CARCAMO** and **REYES LOPEZ** are firearms sources of supply and are one firearm chain-of-supply to **BONILLA FUENTES**.

64.    Through my knowledge, training, and experience, it is common for firearm traffickers to converse with the source of supply before, during, or after a drug or gun sale. The timing of communications established through PRTT between **BONILLA FUENTES** and **REYES LOPEZ**, between **REYES LOPEZ** and **HERNANDEZ CARCAMO**, and between **HERNANDEZ CARCAMO** and **SHARP,** together with the purchase of firearms by **SHARP** and the in-person meetings with **HERNANDEZ CARCAMO**, and payment of moneys by **REYES LOPEZ** to **HERNANDEZ CARCAMO** after sales to the UC, establish probable cause that the firearms sold by **BONILLA FUENTES** to the UC were purchased by **SHARP** in Pennsylvania, transferred by **SHARP** to **HERNANDEZ CARCAMO** in Maryland, then transferred by **HERNANDEZ CARCAMO** to **REYES LOPEZ** who directly supplied the firearms to **BONILLA FUENTES.**

65.    Because **HERNANDEZ CARCAMO**, **REYES LOPEZ**, or **BONILLA FUENTES** never possessed a valid (or any other) handgun qualification license from the state of

Maryland, any transfer of a handgun to any of them in the state of Maryland, or receipt of a

handgun by any of them in the state of Maryland, or conspiracy or conspiracies to do so, was

prohibited by Maryland state law and a "felony" pursuant to and in violation of 18 U.S.C. § 933(a).

The participants in any transfer would have at least had reasonable cause to believe in the illegality

of the transfer because a valid handgun qualification license could not have been presented.  In

addition, each of **HERNANDEZ CARCAMO**, **REYES LOPEZ**, or **BONILLA FUENTES** are

prohibited from receiving a firearm based on their alien status within the United States and would

have at least had reasonable cause to believe that receiving a firearm would be a felony because of

that status.

### III.     ARMAS ESTRADA's Source of Narcotics Supply: MARTINEZ

66.     On or about January 21, 2025, a DEA Confidential Source (CS-2) conducted a

recorded telephone call with **MARTINEZ** on TARGET TELEPHONE 4. **MARTINEZ** advised

CS-2 that he would meet CS-2 to sell him cocaine in Harford County, Maryland. Later that day,

**MARTINEZ** met CS-2 at the Maryland House parking lot in the Interstate 95 median. After

**MARTINEZ** arrived, CS-2 entered **MARTINEZ**'s vehicle. CS-2 was wearing an audio-only

recording device. **MARTINEZ** handed CS-2 a small quantity of cocaine and stated that another

individual, later identified by law enforcement as **ARMAS ESTRADA**, was on his way to provide

him with a larger quantity of the cocaine. CS-2 provided **MARTINEZ** with money (previously

provided to him by DEA).  **ARMAS ESTRADA** arrived at the deal location and handed CS-2 a

paper bag containing approximately nine ounces of cocaine.

67.     CS-2 is a U.S. citizen. CS-2 has a criminal history that includes a conviction for

possession of marijuana and possession of a schedule I or II controlled substance in 2018. CS-2 is

currently facing state charges in Virginia for distribution of controlled substances. CS-2 is

currently working with law enforcement.  No express promises have been made to CS-2 about what he may receive in exchange for his cooperation. The information provided by CS-2 is reliable because law enforcement personally met with CS-2 and was able to judge the CS-2's credibility, and because parts of the information provided by CS-2 has been corroborated through independent means, including audio and visual recordings and surveillance.

*April 2, 2025: Purchase of Fentanyl Pills*

68.    On or about March 31, 2025, agents conducting court-authorized electronic surveillance on **ARMAS ESTRADA** observed **ARMAS ESTRADA** travel from Hyattsville, Maryland to Jersey City, New Jersey, arriving on April 1, 2025.  **ARMAS ESTRADA** arrived at a premises known to be used by **MARTINEZ**.  **MARTINEZ** opened the door, waved at someone outside, and an individual believed to be **ARMAS ESTRADA** entered the front door of the premises.  A short time later, the person believed to be **ARMAS ESTRADA** left the premises. Agents conducting electronic surveillance on **ARMAS ESTRADA** observed him depart Jersey City, New Jersey and drive to the area of his residence in Maryland.

69.    On or about April 2, 2025, CS-2 conducted a telephone call with **MARTINEZ** on TARGET TELEPHONE 4. **MARTINEZ** advised CS-2 that he had 4,500 fentanyl pills available in Maryland. **MARTINEZ** explained to CS-2 that the individual in possession of the pills— **ARMAS ESTRADA**—would call CS-2 to arrange a sale of the pills in Bethesda, Maryland.

70.    CS-2 had a recorded telephone call with **ARMAS ESTRADA** approximately two hours after his prior conversation with **MARTINEZ**. After the call, the two individuals exchanged multiple text messages and phone calls over the course of several hours to discuss the price of the pills and the meeting location. **ARMAS ESTRADA** ultimately set the location for the sale later that evening at 4601 Sangamore Road, Bethesda, Maryland.

71.     At the deal location in Bethesda, CS-2 met with **ARMAS ESTRADA** and purchased 4,500 pills using funds previously supplied by the DEA. CS-2 was equipped with an audio and video recording device. During the transaction, based on a court-authorized PRTT, **ARMAS ESTRADA** contacted **MARTINEZ** on TARGET TELEPHONE 3 to confirm that he had collected the payment for the pills. CS-2 then obtained the fentanyl pills from **ARMAS ESTRADA**. The field test yielded presumptive positive results for methamphetamine.

72.     Following the transaction, **ARMAS ESTRADA** traveled from Maryland to Jersey City, New Jersey. Once **ARMAS ESTRADA** arrived in New Jersey, he and **MARTINEZ** met at an apartment building in Jersey City, New Jersey. Approximately 10 minutes later, **ARMAS ESTRADA** and **MARTINEZ** separated. **MARTINEZ** drove back to his residence and **ARMAS ESTRADA** departed New Jersey and returned to the area of his residence in Maryland. Through training, experience and knowledge of this investigation, I know that it is common for narcotics traffickers to have subordinates that will sell narcotics to customers on behalf of the trafficker that is considered higher up in the drug trafficking organization. Additionally, the investigative team believes that **ARMAS ESTRADA** traveled to New Jersey on April 2, 2025, to deliver the proceeds of the drug sale received from CS-2 to **MARTINEZ**.

### *April 8, 2025: Purchase of Fentanyl and a Firearm*

73.     On April 8, 2025, **ARMAS ESTRADA** sold the UC approximately 315.7 grams of suspected fentanyl pills, a Sig Sauer, model P320, .40 caliber pistol bearing serial number 58B15756, and 52 rounds of assorted ammunition at the Idylwood Plaza Shopping Center in Falls Church, Virginia. The controlled purchase was audio and video recorded.

74.     On April 8, 2025, at approximately 3:15 p.m., **ARMAS ESTRADA** contacted the UC and stated that he only received $9,000 in U.S. currency and not the agreed-upon $10,000. The

UC then instructed **ARMAS ESTRADA** to meet back at the Idylwood Plaza. The two met at the Plaza, and the UC provided the remaining balance in cash to **ARMAS ESTRADA**. **ARMAS ESTRADA** showed the UC two firearms for sale from his cellphone. **ARMAS ESTRADA** also stated that he still had 2,000 pills for sale and asked the UC if he could find a buyer for the pills so **ARMAS ESTRADA** could get more firearms. **ARMAS ESTRADA** stated that he would send photos of the firearms he was going to obtain for the next time they meet.

### *April 9, 2025: Purchase of Fentanyl and Two Firearms*

75.     On April 9, 2025, **ARMAS ESTRADA** sold the UC approximately 344.8 grams of suspected fentanyl and two firearms—a CZ, model CZ P-07, 9mm pistol, bearing serial number B788915, and a Glock, model 19X Gen 5, 9mm pistol, bearing serial number AGBY751. While **ARMAS ESTRADA** was in Prince George's County, Maryland, he arranged to meet with the UC through text messages and recorded phone calls. **ARMAS ESTRADA** and the UC arranged to meet at 5:30 p.m. on April 9, 2025, in the parking lot of the Idylwood Plaza Shopping Center in Falls Church.

76.     On April 9, 2025, before the controlled purchase took place, **ARMAS ESTRADA** called the UC and informed him that he was going to bring one firearm instead of two since one of them was malfunctioning. The UC replied that it was okay for **ARMAS ESTRADA** to bring the one functioning firearm to the deal later that day.

77.     During the deal, **ARMAS ESTRADA** handed the UC a Goodyear shoebox containing the CZ P-087 pistol and two black magazines. The UC asked what happened with the other pistol that **ARMAS ESTRADA** was supposed to sell, and **ARMAS ESTRADA** stated that the firearm did not work, and his gun source had broken it. The UC stated that he had the money ready to purchase the narcotics and two firearms, and **ARMAS ESTRADA** stated that he had his

personal firearm with him that he could sell to the UC. **ARMAS ESTRADA** informed the UC that he had a thirty-round magazine and a "Glock 19" firearm. **ARMAS ESTRADA** exited the UC's vehicle and went to the rear passenger seat of his vehicle. He retrieved a white hard hat from the rear passenger seat and re-entered the UC's vehicle. **ARMAS ESTRADA** handed the UC the thirty-round magazine loaded with three rounds. He also handed the hard hat to the UC, and the UC observed a tan Glock 19 inside the hardhat. The UC then handed **ARMAS ESTRADA** the money for the firearm.

78.    On April 10, 2025, at approximately 12:27 a.m., in Prince George's County, Maryland, **ARMAS ESTRADA** contacted the UC and stated that he had miscounted the amount of fentanyl pills that he sold the day before. The UC asked **ARMAS ESTRADA** if he could pay the remaining balance via Zelle. **ARMAS ESTRADA** instructed the UC to send the money to his phone number (xxx-xxx-3637) and name "Yerson Vazquez." On April 11, 2025, an ATF Special Agent with an undercover Zelle account sent the money to the "Yerson Vazquez" phone number.

### Violations of Federal Criminal Statutes

79.    Based on the foregoing, there is probable cause to believe that **BONILLA FUENTES** has committed criminal offenses including violations of 18 U.S.C. § 922(g)(5) (Possession or Receipt of a Firearm by an Alien), 21 U.S.C. § 841(a), (b)(1)(B) & (C) (Distribution and Possession with Intent to Distribute a Controlled Substance), 21 U.S.C. § 843(b) (Use of Communication Facility for Controlled Substance Offense), and 21 U.S.C. § 846 (Conspiracy to Distribute Controlled Substance).

80.    Based on the foregoing, there is probable cause to believe that **ARMAS ESTRADA** has committed criminal offenses, including violations of 18 U.S.C. § 922(g)(5) (Possession or Receipt of a Firearm by an Alien), 21 U.S.C. § 841(a), (b)(1)(B) & (C) (Distribution

and Possession with Intent to Distribute a Controlled Substance), 21 U.S.C. § 843(b) (Use of Communication Facility for Controlled Substance Offense), and 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance).

81.    Based on the foregoing, there is probable cause to believe that **MARTINEZ** has committed criminal offenses, including violations of 21 U.S.C. § 841 (Distribution and Possession with Intent to Distribute a Controlled Substance), 21 U.S.C. § 843(b) (Use of a Communication Facility for a Controlled Substance Offense), and 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance).

82.    Based on the foregoing, there is probable cause to believe that **SHARP** has committed criminal offenses, including violation of 18 U.S.C. § 922(a)(5) (Transportation or Delivery of a Firearm to a Person from Another State) and 18 U.S.C § 933(a)(1) & (3)(Unlawful Transfer of Firearm and Conspiracy).

83.    Based on the foregoing, there is probable cause to believe that **HERNANDEZ CARCAMO** has committed criminal offenses, including violations of 18 U.S.C. § 922(g)(5) (Alien in Possession or Receipt of a Firearm) and 18 U.S.C. § 933(a)(1),(2) & (3) (Unlawful Transfer and Receipt of Firearm and Conspiracy).

84.    Based on the foregoing, there is probable cause to believe that **REYES LOPEZ** has committed various criminal offenses, including violations of 18 U.S.C. § 922(g)(5) (Alien in Possession or Receipt of a Firearm) and 18 U.S.C. § 933(a)(1),(2) & (3) (Unlawful Transfer and Receipt of Firearm and Conspiracy).

## CONCLUSION

85.    Based on the foregoing, I respectfully submit that there is probable cause to issue the requested criminal complaints and arrest warrants.



_____
Brandon Twentymon
Task Force Officer
Bureau of Alcohol, Tobacco, Firearms & Explosives

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 4(d) this __7th__ day of May, 2025.

_____
The Honorable Ajmel A. Quereshi
United States Magistrate Judge